**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**DONNA N.,**
                              **Plaintiff**

        v.                                              **5:21-cv-01264**

**COMMISSIONER OF SOCIAL SECURITY,**

                              **Defendant.**
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION and ORDER**

Plaintiff Donna N. ("plaintiff" or "claimant") brings this action pursuant to the

Social Security Act, 42 U.S.C. § 405(g), for review of a final determination by the

Commissioner of Social Security ("Commissioner" or "defendant") denying her

application for disability insurance benefits.  Plaintiff alleges that the Administrative

Law Judge's ("ALJ") decision denying her application for benefits was not supported by

substantial evidence and contrary to the applicable legal standards.  Pursuant to

Northern District of New York General Order No. 8, the Court proceeds as if both parties

had accompanied their briefs with a motion for judgment on the pleadings.

I.  **PROCEDURAL HISTORY**

On September 11, 2019, Plaintiff filed for Title II Disability Insurance Benefits

("DIB"), alleging disability beginning June 1, 2019 due to bipolar disorder, depression,

post-traumatic stress disorder (PTSD), and problems with comprehension,

concentration, memory, and cholesterol. Administrative Record (T) at 79-81. The

Agency denied her claim initially on January 27, 2020 and on reconsideration on July

29, 2020. T 79, 116. After hearings held January 25, 2021 (T 44) and March 3, 2021 (T 33), ALJ Elizabeth W. Koennecke issued an unfavorable decision dated March 16, 2021 (T 10-22). On September 21, 2021, the Appeals Council denied review (T 1), making the ALJ's decision the final Agency decision. This action followed. This Court has jurisdiction under 42 U.S.C. § 405(g).

## II   LEGAL STANDARDS

### A. Standard of Review

"District courts review a Commissioner's final decision pursuant to 42 U.S.C §§ 405(g) and 1383(c)(3), and 'may only set aside a determination by the Commissioner if it is based on legal error or not supported by substantial evidence in the record.'" *Hill v. Comm'r of Soc. Sec.*, No. 1:19-CV-5096 (ALC), 2020 WL 5768726, at *5 (S.D.N.Y. Sept. 28, 2020)(quoting *Cole v. Colvin*, 12-cv-8597, 2014 WL 1224568, at "*2 (S.D.N.Y. Mar. 24, 2014)).  "Accordingly, [a court] must 'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Rucker v. Kijakazi*, 48 F.4th 86, 91 (2d Cir. 2022)(quoting *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019)).  A court "will overturn a SSA decision only if the ALJ applies an incorrect legal standard, or if the ALJ's ruling is not supported by substantial evidence." *Id.* (citation omitted). "The substantial evidence standard is 'not high.'" *Id.* (quoting *Colgan v. Kijakazi*, 22 F.4th 353, 359 (2d Cir. 2022) (quotation marks omitted)). "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008) (quotation marks omitted)). Properly applied,

this standard is highly deferential to the presiding ALJ, "who has seen the hearing up close." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

"[O]nce an ALJ finds facts, [the Court] can reject those facts 'only if a reasonable factfinder would *have to conclude otherwise*.'" *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original). The Court must not re-weigh evidence, assess the reliability of witnesses, or otherwise substitute its judgment for the ALJ's. *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

Where the record supports disparate findings and provides adequate support for both the Plaintiff's and the Commissioner's positions, a reviewing court must accept the ALJ's factual determinations. *See Quinones v. Chater*, 117 F.3d 29, 36 (2d Cir. 1997)(citing *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)); *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  "However, this 'deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law.'" *Kenneth H. v. Commr. of Soc. Sec.*, 6:21-CV-324, 2022 WL 2954364, at *3 (N.D.N.Y. July 26, 2022)(quoting *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003)). "Thus, 'where there is a reasonable basis for doubting whether the Commissioner applied the appropriate legal standards,' the decision should not be affirmed." *Id.* (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)). "This is so regardless of whether or not the decision is otherwise supported by 'substantial evidence.'" *Id.* (citing *Johnson*, 817 F.2d at 986).

Although the reviewing court must give deference to the Commissioner's decision, a reviewing court must bear in mind that the Act is ultimately "'a remedial statute which must be 'liberally applied;' its intent is inclusion rather than exclusion.'" *Vargas v.*

*Sullivan*, 898 F.2d 293, 296 (2d Cir. 1990)(quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

## B. Determination of Disability

To obtain DIB, the claimant must prove that she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1). The Commissioner evaluates disability claims using the five-step sequential process in 20 C.F.R. § 404.1520(a)(4). The claimant has the burden of proof at steps one through four, which includes establishing her residual functional capacity ("RFC") *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). A plaintiff's RFC is defined as "what an individual can still do despite his or her limitations.... Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis[.]" *Pardee v. Astrue*, 631 F. Supp. 2d 200, 210 (N.D.N.Y. 2009) (quoting *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (citation omitted)). "In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, [and] symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis." *Id.* (citing 20 C.F.R. § 404.1545(a)).  If the claimant reaches step five, the Commissioner must produce evidence that the claimant could perform a significant number of jobs given her age, education, work experience, and RFC. *Id.* Generally, the Commissioner can rely on

vocational expert testimony for that purpose. *Biestek*, 139 S. Ct. at 1148, 1152; *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 & n.4 (2d Cir. 1983).

**III     FACTUAL**

**A.  Age, Education, and Work Experience**

Plaintiff was 60 years old on the alleged onset date and 61 years old on the date last insured. T 22, 80. She has a high school education. T 282. She reported working in manufacturing/assembly and inspection in the past. T 282.

**B.  Opinion Evidence**

On October 16, 2019, psychiatrist James Donovan, M.D. completed a Medical Source Statement citing Plaintiff's diagnosis of bipolar disorder. T 611. Plaintiff did have a good response to Lamictal, though her condition was labeled chronic. T 611. Dr. Donovan's last exam occurred on July 15, 2019, where he observed variable mood. T 611. Dr. Donovan wrote a note concerning ability to function in a work setting that appears to read: "limited[,] does not do well with pressure [and/] or stress." T 612. Concerning activities of daily living: "limited, depends on husband for transport etc." T 612. Dr. Donovan affirmed that Plaintiff was limited in the areas of understanding/ memory, sustained concentration/persistence, social interaction, and adaption. T 612-13.

On October 29, 2019, Dr. Donovan completed a second Medical Source Statement citing Plaintiff's diagnosis of bipolar disorder mixed episode with a guarded prognosis. T 616. He affirmed signs/symptoms including decreased energy, feeling of guilt/worthlessness, poverty of content of speech, generalized persistent anxiety, mood disturbance, emotional lability, flight of ideas, persistent disturbance of mood or affect,

and easy distractibility. T 616. Dr. Donovan opined that Plaintiff was unable to meet competitive standards (defined as "your patient cannot satisfactorily perform this activity independently, appropriately, effectively and on a sustained basis in a regular work setting") in the abilities to i) complete a normal workday and workweek without interruptions from psychologically based symptoms; ii) perform at a consistent pace without an unreasonable number and length of rest periods; iii) deal with normal work stress; and iv) travel in unfamiliar place. T 617. He opined that Plaintiff was seriously limited but not precluded (defined as "ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances") in the abilities to i) maintain regular attendance and be punctual within customary, usually strict tolerances, ii) sustain an ordinary routine without special supervision, iii) work in coordination with or proximity to others without being unduly distracted, iv) accept instructions and respond appropriately to criticism from supervisors, and v) maintain socially appropriate behavior. T 617.  Dr. Donovan explained: "uncomfortable in [illegible] situations, not good under stress, needs stress reduction, breaks." T 617.

On December 2, 2019, Jeanne Shapiro, Ph.D. conducted a psychological consultative examination at the request of the Agency. T 627. Plaintiff discussed childhood sexual trauma, which resulted in recurrent distressing memories and trust issues. T 628. She also discussed nervousness from a 2011 car accident. T 628. Plaintiff denied symptoms indicative of panic disorder. T 628. Plaintiff discussed difficulty with comprehension and anger management. T 628. Plaintiff was cooperative and responsive to questioning with adequate relating, social skills, and overall presentation. T 629.  She had normal posture, appropriate eye contact, and a lethargic

6

motor behavior. *Id.* Her speech was fluent, and her expressive and receptive language was adequate. *Id.* Her thought processes were coherent and goal directed without any evidence of delusions, hallucinations, or disordered thinking. *Id.* Plaintiff reported feeling "so-so," and she had a sad mood with a constricted affect. *Id.* She was oriented x3 with intact attention and concentration. *Id.* Plaintiff's recent and remote memory skills were intact. T 630. Her intellectual functioning was estimated to be in the deficient range. *Id.* She had poor insight and judgment. *Id.*  Dr. Shapiro observed lethargic motor behavior, constricted affect that was somewhat reduced in intensity compared to her thoughts/speech, and poor insight and judgment. T 629-30. Dr. Shapiro opined that Plaintiff had moderate-to-marked limitation in the abilities to i) understand, remember, or apply complex directions and instructions due to cognitive deficits, ii) interact adequately with supervisors, coworkers, and the public, iii) sustain concentration and perform a task at a consistent pace depending upon her level of anxiety, and iv) regulate emotions, control behavior, and maintain well-being. T 630. Dr. Shapiro further opined that Plaintiff has moderate limitation in the ability to sustain an ordinary routine and regular attendance at work and mild-to-moderate limitation in the ability to be aware of normal hazards and take appropriate precautions, especially if reading is required to do so. T 630.

On December 2, 2019, Kalyani Ganesh, M.D. conducted a physical consultative examination at the request of the Agency. T 621. Plaintiff was in no acute distress, had a normal gait, and could walk on her heels and toes without difficulty. T 622. Her stance was normal, and she had a full squat. *Id.* She could get on and off the examination table without assistance and could rise from a chair without difficulty. *Id.* She had full range of

motion in her cervical and lumbar spine with the exception that her lumbar spine flexion was limited to 60 degrees. T 623. She had full range of motion in her hips, knees, and ankles with stable joints and no tenderness. *Id.* Plaintiff had no sensory deficits and full strength in all her extremities. *Id.* Dr. Ganesh ordered an x-ray of Plaintiff's lumbar spine, which showed moderate degenerative changes at the T10-L2 levels and mild degenerative changes at the L2-S1 level. T 625. Dr. Ganesh opined that Plaintiff had no gross limitations. T 623.

On January 28, 2020, S. Naroditsky, M.D. reviewed the record at the request of the Agency and opined limitations consistent with light work with postural limitations. T 88-89.

On January 31, 2020, H. Ferrin, Ph.D. reviewed the record at the request of the Agency and opined that Plaintiff was able to i) understand and remember detailed instructions and work procedures, ii) perform repetitive tasks on a sustained basis in settings without tight productivity requirements, iii) respond in an appropriate manner to co-workers and supervisors but would have difficulty functioning in a setting that involved significant contact with the general public, and iv) adapt to basic changes and make routine work-like decisions. T 93.

On July 27, 2020, J. Ochoa, Psy.D. reviewed the record at the request of the Agency and essentially affirmed Dr. Ferrin's opinion. T 113.

On July 29, 2020, T. Schmidt-Deyoung, M.D. reviewed the record at the request of the Agency and opined limitations consistent with light work with slightly different postural limitations. T 106-10.

**C. Clinical Evidence**

Dr. Donovan's records indicate that in 2018, prior to Plaintiff's alleged onset date, her mood remained stable on Zoloft and Lamictal. T 339-41. She reported "once in a while she gets a little testy," but not enough to want to change her medications. T 339. Her mental status examination was normal. *Id.* In December 2018, she felt increasingly emotional and agitated. T 338. Dr. Donovan increased her Zoloft medication and added Nuedexta at that visit. *Id.*

In March 2019, Plaintiff fell off a stool at work and landed on her right knee. T 343. She reported that when she put pressure on the knee, her pain increased, and over-the-counter medications provided only minimal relief for her symptoms. *Id.* On examination, she had a normal range of motion and no swelling in her right knee, but there was some tenderness. T 344. An x-ray showed a possible avulsion fracture, but a CT was recommended to confirm. T 342, 344-45. She was advised to keep her leg immobile and follow up with orthopedics for a CT scan. T 345. She met with orthopedist Matthew Scuderi, M.D., the next day. T 475. Plaintiff reported she had no pain when walking but she had tenderness on her knee with palpation. *Id.* On examination, Plaintiff had full range of motion and only mild discomfort in her right knee. *Id.* Dr. Scuderi recommended a wait-and-see approach given the benign examination. *Id.*

Three weeks later, in April 2019, Plaintiff had "dramatically improved." T 481. She reported not missing any work due to her injury. *Id.* On examination, her knee was stable, and her range of motion was well preserved with only mild crepitus. *Id.* Dr. Scuderi continued her on over-the-counter medication management. *Id.* Plaintiff also presented to Dr. Donovan that month in a positive mood. T. 633. She described doing moderately well with some difficulties shutting her mind off at night. *Id.* Her mental

status examination showed tight associations but was otherwise normal. *Id*. Dr. Donovan instructed her to start melatonin to help with sleep and continue with Zoloft and Lamictal. *Id*.

In June 2019, her alleged onset date, Plaintiff met with Dr. Scuderi again and reported pain with squatting and kneeling. T 487. She reported Tylenol controlled her pain and she "actually fe[lt] mildly improved." *Id*. Her right knee was stable, and she had a well-preserved range of motion with mild crepitus. *Id*. There was no provocative positioning on examination, and she had a negative McMurray's test. *Id*. Dr. Scuderi offered a corticosteroid injection, but based on her improvement, Plaintiff decided to hold off at that time. T 488. He continued her on over-the-counter medication management. *Id.* A month later, Plaintiff reported intermittent soreness and that she remained fairly active. T 494. Her exam saw mild right knee crepitus with normal motion. T 494. Dr. Scuderi assessed right knee baseline chondrosis with moderate exacerbation. T 494.  She elected to proceed with the injection. *Id.* Dr. Scuderi administered Depo Medrol. T 495. Plaintiff was to progress activities to tolerance, exercising caution with deep weighted squats and lunging. T 495. Plaintiff was allowed to return to work. T 495.

On July 15, 2019, Plaintiff saw Dr. Donovan for medication review. T 634. Plaintiff expressed frustration with her job and plan to start a new job. T 634. She stated she had a new job lined up in a plastic packaging factory. *Id*. Plaintiff took Lamictal twice a day and Zoloft three times a day. T 634. Plaintiff was happy with her medications. T 634. Her mental status examination showed tight associations and exuberant mood.

*Id.* Dr. Donovan noted that Plaintiff had a euthymic mood, although "way too exuberant at times," but not to a manic degree. T 634.

On November 1, 2019, Plaintiff saw Stephanie Clapper, M.D. of CNY Family Care for complaints including low back pain radiating into the left hip. T 649. Heat helped temporarily with use of Tylenol, but certain movements worsened pain to such a degree that it would take her breath away. T 649. Exam noted left lumbar spasm and tenderness, but full strength in her lower extremities. T 651.  Dr. Clapper recommended Plaintiff use moist heat, gentle stretching, and take Tylenol or ibuprofen for the pain. T 652. She indicated that if the pain did not improve, she would prescribe Plaintiff a muscle relaxer and refer her to physical therapy. *Id.*  Dr. Clapper advised: "Do not do any activities that are causing more discomfort but okay to do gentle walking if comfortable." T 652. Plaintiff was also to continue medication for depression/bipolar. T 652.

On November 26, 2019, Plaintiff returned to Dr. Donovan's office. T 635. Dr. Donovan noted: "She is reporting that her moods are pretty stable. She does have flashbacks to an accident 11 years ago. Apparently on this thruway some car was coming at them and she started crying[.] [S]he keeps getting flashbacks to this. It makes her particularly nervous [on the] thruway riding in a car driven by someone." T 635. Exam noted some kind of suspicious paranoid thoughts. T 635. Her thought processes remained logical and sensible with uncompromised judgment and insight. *Id.*

Plaintiff returned to Dr. Clapper's office in February 2020 for back pain. T 656. She reported low back pain lasting for the past two weeks. *Id.* On examination, Plaintiff had some point tenderness in the lower right thoracic musculature that worsened with

11

movement or twisting. T 658. She started taking a muscle relaxer for the spasms. *Id*. Dr. Clapper advised her against heavy lifting, pulling, or pushing at that time. *Id.* She recommended Plaintiff start physical therapy if the pain did not improve. *Id*.

On February 11, 2020, Dr. Donovan's office issued a letter stating that his practice was closing due to Dr. Donovan's hospitalization. T 647.

On February 12, 2020, Plaintiff saw Amy Russell, PA of CNY Family Care concerning her back pain. T 656. Pain did not radiate down the leg, but there was some pain behind the right arm. T 656. On exam, PA Russell noted, "[p]oint tenderness right lower thoracic musculature, pain worsens with movement of right arm and twisting motion." T 658. She prescribed cyclobenzaprine for back spasms. T 658.

In May 2020, Plaintiff had her annual physical examination with Dr. Clapper.  T 671. Plaintiff had no pain, was exercising sporadically, had no medication side effects, and did not follow her recommended diet. *Id.* Plaintiff had a full range of motion in all her extremities with normal muscle strength. T 673. She was alert and oriented x3. *Id.*

On May 15, 2020, Plaintiff saw psychiatrist Miranda Mohabir, M.D. T 660. Plaintiff explained that she had been in treatment since 1985 and on medication since 1994. T 660. She had seen Dr. Donovan for about seven years. T 660. She had always had good and bad days. T 660.  Plaintiff had a history of hypomania lasting from a few hours to two days, though she was mostly depressed. T 660. She historically and currently felt slightly paranoid, thinking people were talking about her. T 660. Plaintiff noted childhood sexual abuse resulting in removal to foster care at age 14. T 660. Plaintiff noted that she worked most of her life, but could not work at her last job due to depression. T 661. Dr.

12

Mohabir diagnosed bipolar II disorder, mostly depressed. T 661. She increased Zoloft and prescribed Lamictal and trazodone. T 661.

In July 2020, Plaintiff requested that Dr. Clapper take over prescribing her psychiatric medications. T 728. In November 2020, Dr. Clapper commented that Plaintiff's mental health symptoms were stable on medication. T 685.

### D.  Hearing Testimony

At the January 2021 hearing, Plaintiff testified to the following: She left her last job due to having some issues with her ability to read paperwork, sitting at her station and crying for no reason. T 52. She struggled to remember what paperwork she had been asked to retrieve from a cabinet. T 52. Presently, she could not fill out doctor's office forms without help and she would "fly off the handle" at times. T 54. She testified that it did not take much for her to have an emotional outburst, which could occur as much as twice a week. T 55.  Plaintiff reported seeing a counselor named Allan. T 56. When asked if he had any problems with her knees, Plainif responded that if she stood for a long period of time she could "hardly walk." T 56. When asked about any symptoms that would prevent her from working a full-time job, Plaintiff stated: "I can't comprehend what they want me to do. Every job I've had, I've had to have help doing the job." T 56. With regard to her back symptoms, she stated: "It bothers me to the point where I have to go and sit for a little bit because it hurts so bad. And if I bend over a lot, that would bother me. And doing everyday chores bothers me." T 57. When asked by the ALJ what treatment Plaintiff had for her knee, she responded that she had physical therapy approximately 6 years previous, that she was "trying to do a little bit of exercise at home," but she had not had surgery or any additional shots. T 58. When asked what

treatment she's had for her back complaints, Plaintiff said she has had none but was "just taking Tylenol." T 58.

On March 3, 2021, the ALJ held a supplemental hearing at which time impartial vocational expert Kim Bates, C.R.C., testified. T 33-42.  Bates opined that under the ALJ's RFC Plaintiff could not perform her past relevant work, but that Plaintiff could perform the requirements of representative occupations such as garment sorter, office helper, and mail clerk all of which are considered light, unskilled work, and that she could perform the representative occupation of laundry worker, which is considered medium, unskilled work. *Id.* Bates further stated that a sufficient number of jobs in each of these classifications existed in the national economy. *Id*.; *see also* T 10, 20-22.

### III.   THE ALJ'S DECISION

The ALJ engaged in the five-step analysis required by 20 C.F.R. § 416.920(a) to determine whether the claimant qualified for disability benefits. The ALJ found that Plaintiff met the insured status requirements through December 31, 2020 and did not engage in substantial gainful activity between the alleged onset date and date last insured (June 1, 2019 to December 31, 2020). T 12-13. The ALJ found Plaintiff had the following severe impairment: a mental impairment variously characterized as depression and/or PTSD. T 13. The ALJ found that no combination of impairments met or equaled a listing. T 14. The ALJ found that Plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels, except:

> The claimant can perform simple tasks, but not at a production rate pace or to strict quota requirements. She is limited to simple instructions and simple work-related decisions. The claimant is limited to only occasional interaction with supervisors, coworkers, or the public. She should not perform teamwork or tandem tasks. The claimant is limited to a static work environment, with only occasional changes in the work setting.

T 16. The ALJ determined that Plaintiff was unable to perform her past relevant work. T 20. However, the ALJ also determined that Plaintiff was able to perform other work as a garment sorter, office helper, mail clerk, and laundry worker. T 21.

## IV.   DISCUSSION

Plaintiff presents two issues on appeal:

1. The ALJ failed to support with substantial evidence her evaluation of the mental opinion evidence in accordance with regulation; and

2. The ALJ failed to support with substantial evidence her evaluation of the physical opinion evidence in accordance with regulation.

On the first issue, Plaintiff argues:

> The ALJ's analysis of Dr. Ferrin's and Dr. Ochoa's non-examining opinions was flawed and did not duly consider the primary factors of supportability and consistency. Dr. Shapiro's and Dr. Donovan's opinions duly considered Plaintiff's ability to deal with stressors and the bipolar nature of Plaintiff's condition, and the ALJ's analysis of all four opinions did not suitably undermine the persuasive value of Dr. Shapiro's and Dr. Donovan's opinions.

Pl. Br. 7. On the second issue, Plaintiff argues that "[t]he ALJ failed to consider the important factor of supportability in considering Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions. *Id.,* 13.  Based on these reasons, Plaintiff argues, remand is required. The Commissioner opposes both arguments and contends that the ALJ's determination should be affirmed. *See generally*, Def. Br.

### Assessing Medical Opinions

Under the new regulations applicable to Plaintiff's claim, the Commissioner will no longer give specific evidentiary weight to medical opinions. *Elizabeth P. v. Comm'r of Soc. Sec.*, No. 3:20-CV-891 (CFH), 2022 WL 507367, at *4 (N.D.N.Y. Feb. 18, 2022);

*see Wanda N. v. Comm'r of Soc. Sec.*, No. 6:21-CV-00358, 2022 WL 4376484, at *6 (N.D.N.Y. Sept. 22, 2022); *Warren I. v. Comm'r of Soc. Sec.,* No. 5:20-CV-495 (ATB), 2021 WL 860506, at *4 (N.D.N.Y. Mar. 8, 2021). "Rather, the Commissioner must consider all medical opinions and 'evaluate their persuasiveness' based on: supportability; consistency; relationship with the claimant (which includes the length of treatment relationship, frequency of examinations, purpose and extent of the treatment relationship, and examining relationship); specialization; and 'other factors.'" *Elizabeth P.*, 2022 WL 507367, at *4 (quoting 20 C.F.R. § 404.1520c(a)-(c)).

"The regulations explain that when 'evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings,' the "'most important factors ... are supportability ... and consistency.'" *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022) (summary order)(footnote omitted)(quoting 20 C.F.R. § 404.1520c(a)); *see Raymond M. v. Comm'r of Soc. Sec.*, No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *8 (N.D.N.Y. Feb. 22, 2021)("At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency of each of the medical opinions, 'pointing to specific evidence in the record supporting those findings.'")(citing *Jacqueline L. v. Commissioner*, No. 6:19-CV-6786, 2021 WL 243099, at *6 (W.D.N.Y. January 26, 2021)). "'Supportability' means '[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.'" *Celia A. B. v. Commr. of Soc. Sec.*, 5:21-CV-112 (CFH), 2022 WL 4225540, at *4 (N.D.N.Y. Sept. 13, 2022)(quoting 20 C.F.R. §

404.1520c(c)(1)); *see Andrea G. v. Commr. of Soc. Sec.*, 5:20-CV-01253 (TWD), 2022

WL 204400, at *4 (N.D.N.Y. Jan. 24, 2022) ("Under the supportability factor, the more a

medical opinion or prior administrative medical finding is reinforced by 'relevant ...

objective medical evidence and supporting explanations,' the 'more persuasive' it will

be.")(quoting 20 C.F.R. § 404.1520c(c)(1), and citing *Carmen M. v. Comm'r of the Soc.*

*Sec. Admin*, No. 20-CV-06532-MJR, 2021 WL 5410550, at *4 (W.D.N.Y. Nov. 19, 2021)

("The supportability factor asks how well a medical source supported their opinion(s)

with objective medical evidence and supporting explanations.")). "'Consistency' means

'[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is

with the evidence from other medical sources and nonmedical sources in the claim, the

more persuasive the medical opinion(s) or prior administrative medical finding(s) will

be.'" *Celia A. B.*, 2022 WL 4225540, at *4 (quoting 20 C.F.R. § 404.1520c(c)(2)).

As Judge Hummel recently explained:

"If the ALJ fails adequately to explain the supportability and consistency
factors, or bases [his or] her explanation upon a misreading of the record,
remand is required." *Rivera v. Comm'r of the Soc. Sec. Admin*., No. 19-CV-
4630 (LJL/BCM), 2020 WL 8167136, at *14 (S.D.N.Y. Dec. 30, 2020),
report and recommendation adopted, 2021 WL 134945 (S.D.N.Y. Jan. 14,
2021) (citation and quotation marks omitted).  . . .

"[T]he ALJ's conclusion [need] not perfectly correspond with any of the
opinions of medical sources cited in his [or her] decision, [and] he [or she]
[i]s entitled to weigh all of the evidence available to make an RFC finding
that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F.
App'x 53, 56 (2d Cir. 2013) (summary order). The Court "defer[s] to the
Commissioner's resolution of conflicting evidence[.]" *Smith v. Berryhill*, 740
F. App'x 721, 726 (2d Cir. 2018) (summary order) (citation and quotation
marks omitted). Therefore, even if a plaintiff disagrees with the ALJ's
assessment of opinion evidence and can point to evidence in the record to
support his or her position, "whether there is substantial evidence
supporting the [plaintiff's] view is not the question [ ]; rather, [the Court]
must decide whether substantial evidence supports the ALJ's decision."
*Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary
order) (emphasis omitted). The ALJ must not "ignore evidence or cherry

pick only the evidence from medical sources that support a particular conclusion and ignore the contrary evidence" but "[t]he Court will not reweigh the evidence that was before the ALJ." *April B. v. Saul*, No. 8:18-CV-682 (DJS), 2019 WL 4736243, at *6 (N.D.N.Y. Sept. 27, 2019) (citations and internal quotation marks omitted).

"It is well settled that, under both the old and new regulations concerning the evaluation of medical evidence, an ALJ may rely on the opinion of a non-examining state agency consultant in disability claims." *Amber H. v. Saul*, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at *5 (N.D.N.Y. May 24, 2021). "[A]n ALJ need not recite every piece of evidence that contributed to the decision, so long as the record permits [the reviewing court] to glean the rationale of an ALJ's decision." *Renalda R. v. Comm'r of Soc. Sec.*, 20-CV-0915 (TWD), 2021 WL 4458821, at *5 (N.D.N.Y. Sept. 29, 2021) (citations and quotation marks omitted).

*Elizabeth P.,* 2022 WL 507367, at *4. However, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Social Security Ruling 96-8p, at *7 (July 2, 1996).  The failure to do so is grounds for remand. *Herrera v. Comm'r of Soc. Sec.*, No. 20-CV-6211 (PKC), 2022 WL 4643044, at *7 (E.D.N.Y. Sept. 30, 2022).

### Opinions Related to Plaintiff's Mental Limitations

### Drs. Ferrin and Ochoa

The ALJ found the prior administrative medical findings from Drs. Ferrin and Ochoa persuasive. T 18-19. The ALJ noted that Dr. Ferrin found that Plaintiff is moderately limited in her ability to maintain concentration, interact with the public, respond to changes, and complete a normal workday or workweek without interruption from psychological symptoms. T 18-19. The ALJ noted that Dr. Ochoa concurred with Dr. Ferrin's assessment, and that Dr. Ochoa wrote that Plaintiff retains the ability to perform repetitive tasks on a sustained basis, in settings without tight productivity

requirements. T 19.  The ALJ also noted that Dr. Ochoa opined that Plaintiff is able to

adapt to basic changes and make routine work-related decisions. T 19. The ALJ wrote:

> Dr. Ferrin and Dr. Ochoa are mental health experts. Their opinions are
> based upon reviews of relevant medical evidence, and are supported by
> detailed explanations. Additional factors adding to the persuasiveness of
> the doctors' assessments are their familiarity with the Agency's disability
> program policies and evidentiary requirements, and the fact that the explicit
> purpose of their reviews was to render a medical opinion on disability using
> said criteria. No records were submitted at the hearing level which would
> militate against their opinions. For these reasons, although I have adopted
> slightly greater restrictions in social interaction, I find the assessments of
> Dr. Ferrin and Dr. Ochoa to be persuasive accounts of the claimant's
> functioning.

T 19.

Plaintiff argues that "[t]he non-examining opinions merely state conclusions about

what Plaintiff can allegedly do without connecting such estimation to any evidence.

There is a brief parroting of Dr. Shapiro's and Dr. Donovan's opinions, with which the

non-examining opinions appeared to disagree, but there was no statement of why

Plaintiff could perform in accordance with the non-examining opinions and not do more

than that." Pl. Br. at 9 (citing T 93, 113).  Moreover, Plaintiff maintains:

> The non-examining reports declined to mention Dr. Shapiro's observation of
> lethargic motor behavior (T 629), and they indicated that Dr. Donovan did
> not submit any treatment records (T 113) despite the record containing Dr.
> Donovan's records showing sub-manic behavior (T 634), discussion of
> flashbacks and paranoid thoughts (T 635). Dr. Donovan's note
> predating the alleged onset date noted episodes of hyperemotionality and
> agitation including throwing of a radio. T 338.

Pl. Br. 9-10.

As the Commissioner argues, however, Dr. Ferrin noted that Plaintiff was never

psychiatrically hospitalized and only saw her former psychiatrist, Dr. Donovan, every

three months. T 92. He explained that Plaintiff's symptoms and limitations in Dr.

Donovan's second treating source opinion seemed inconsistent with the generally unremarkable mental status examination contained in the first opinion. *Id*. Dr. Ferrin noted that Plaintiff had a variable mood on mental status examination, which was improved with medication, but her mental status was otherwise normal. *Id.* Further, Dr. Ferrin noted Plaintiff's report that she could drive independently seemed to contradict Dr. Donovan's opinion that Plaintiff could not travel to unfamiliar places. *Id.* Dr. Ferrin noted there were no additional treatment records from Dr. Donovan at the time of his review. *Id.*

Dr. Ferrin further discussed the symptoms Plaintiff reported at the consultative examination with Dr. Shapiro. T 92-93. He discussed the mental status examination, which showed a constricted affect and sadness; poor insight and judgment; intact attention and concentration; and intellectual functioning estimated to be in the deficit range. *Id.* However, Dr. Ferrin also noted that Plaintiff's report to Dr. Shapiro that she could not comprehend how to manage money contradicted her earlier statement in the function report. T 93.

Dr. Ochoa similarly considered this evidence, Dr. Ferrin's findings, and the new evidence submitted at the reconsideration level. T 112-13. The new evidence included treatment notes from Dr. Donovan illustrating Plaintiff's stability on mediation and unremarkable mental status examinations. T 113. Dr. Ochoa affirmed Dr. Ferrin's findings. *Id.*

The ALJ properly considered the supportability factor by explaining that Drs. Ferrin and Ochoa "are mental health experts, and are well versed in Agency standards and evidentiary requirements. Their assessments are consistent with the record as a

20

whole and unrebutted." T 16. The ALJ also stated that their opinions "are based upon reviews of relevant medical evidence, and are supported by detailed explanations."  T 19.

The ALJ also explained that Drs. Ferrin's and Ochoa's findings were consistent with the relevant medical evidence available for review as well as the records submitted after their reviews. *See* T 18-19; 20 C.F.R. § 404.1520(c)(2) (the more consistent the prior administrative medical findings are with the evidence from other medical sources and nonmedical sources, the more persuasive). The ALJ discussed these mental health treatment notes in the decision. T 18. As the Commissioner argues, Dr. Donovan's treatment records from the relevant period, not specifically referenced by Dr. Ochoa, showed essentially unremarkable examinations with some discussion of sleeping difficulties, which resolved, and some paranoid thoughts relating to a car accident 11 years prior. T 113, 633-35. The ALJ also acknowledged the treatment notes depicting Plaintiff as cooperative and displaying appropriate mood and affect. T 18 (citing T 487, 494, 651). The ALJ noted that in November of 2020, Plaintiff reported feeling "okay" despite some continuing symptoms. T 18 (citing Tr. 681). Dr. Clapper noted Plaintiff's mental health was stable on her medications, but she should follow up with her new counselor and start exercising to improve her mood. T 685. Accordingly, the ALJ appropriately determined the prior administrative medical findings were consistent with the record as a whole. Thus, the ALJ properly considered the two most important factors in the persuasiveness assessment.

Plaintiff also assigns error because Drs. Ferrin and Ochoa did not provide a sufficient rationale for their findings. Pl. Br. 9-10.  However, as the Commissioner

argues, Plaintiff fails to cite regulatory authority that Drs. Ferrin and Ochoa needed to explain not only why Plaintiff remained capable of performing the activities cited, but also why she could "not do more than that." Def. Br. 9. Moreover, Drs. Ferrin and Ochoa discussed the mostly unremarkable objective findings, while simultaneously noting Plaintiff did occasionally experience symptoms. T 92-93, 112-13.  Further, they explained how evidence contradicted some of the opined limitations from Drs. Donovan and Shapiro. *Id.* They then provided findings regarding what Plaintiff could still do. *Id.* Accordingly, their prior administrative medical findings both identified supportive evidence and provided supportive explanations consistent with the record.

Plaintiff also argues that that Dr. Donovan's treatment records were not sufficiently discussed. Pl. Br. 9-10. The Commissioner argues that Plaintiff cites to no regulatory authority that every record needed to be cited by the state agency psychologists, and that an ALJ is not required to discuss every treatment record. Def. Br. 10 (citing *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (ALJ not required to mention all the evidence presented to him or explain why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability)). Moreover, as the Commissioner contends, Dr. Ochoa reviewed Dr. Donovan's treatment records, which were submitted at the reconsideration level. T 113. Dr. Ochoa specifically cited to the July 2019 note identified in Plaintiff's brief. T 113, 634.  As the Commissioner points out, at that appointment Plaintiff presented as excited because she was set to start a new job and she was happy. T 634. Dr. Donovan reported her mood "although way too exuberant at times, but [was] not in a manic direction, normal." *Id.*  While Dr. Ochoa did not explicitly discuss the other two treatment

records from December 2018 and November 2019 that Plaintiff cites, Plaintiff experienced difficulties in December 2018, six months prior to her alleged onset date, and Dr. Ochoa noted that later records, as well as some earlier records, depicted a stable mood. T 113; *see* T 339-41, 633-5.

Additionally, as the Commissioner argues, Plaintiff fails to explain how a treatment record prior to her alleged onset date could render the prior administrative medical findings inaccurate. Further, in November 2019, Plaintiff merely reported that on her way to the appointment she had a flashback to a car accident 11 years ago. T 635. Dr. Donovan noted she had "some kind of suspicious paranoid thoughts" in relation to this but her mental status was otherwise normal. *Id.*  Plaintiff offers no explanation of how this treatment note demonstrated error in Dr. Ochoa's findings.

Plaintiff alleges the discussions by Drs. Ferrin and Ochoa regarding her ability to handle money was flawed. Pl. Br. 10. But the Court agrees with the Commissioner that Plaintiff fails to illustrate error in this regard.  Drs. Ferrin and Ochoa acknowledged that Plaintiff reported to Dr. Shapiro that she could not comprehend how to handle money. T 93, 113, 630. However, they accurately noted that the record contained contradictory evidence on this matter. T 93, 113. Plaintiff self-reported in her function report she could pay bills and count change, although she could not handle a savings account.  Tr. 300. She noted that her condition did not affect her abilities in this area. *Id*. While her husband reported Plaintiff could not comprehend any of the tasks related to money and he took care of it all, T 291, Dr. Donovan reported Plaintiff could handle her own benefits, if awarded, and her fund of information, ability to perform calculations, etc. were all within normal limits. T 611-12. Thus, Drs. Ferrin and Ochoa accurately noted

conflicting evidence. Therefore, Plaintiff fails to illustrate any inaccuracy in their discussion.

It is also important to note that, while the ALJ found the prior administrative medical findings persuasive, she included some additional, more restrictive, limitations in the RFC. As the Commissioner points out, the Second Circuit recently reiterated its holding that "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) (citing *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013); *Richardson v. Perales*, 402 U.S. 389, 399 (1971)). Thus, the ALJ permissibly limited Plaintiff to simple work and only occasional interaction with coworkers and supervisors, which reflected some of the limitations from Dr. Donovan's opinion. T 16.

### Dr. Shapiro

The ALJ found Dr. Shapiro's opinion less persuasive. T 19. The ALJ noted Dr. Shapiro based her opinion on the examination findings, although she only examined Plaintiff once. T 19; 20 C.F.R. § 404.1520c(c)(1). However, the ALJ explained that Dr. Shapiro's testing results demonstrated Plaintiff's attention and concentration were intact, which provided poor support for her opined limitation of marked difficulties in concentration. T 19. Additionally, the ALJ explained Dr. Shapiro's opinion that Plaintiff would have difficulties sustaining regular workplace attendance was speculative and not supported by any evidence. *Id.*

As the Commissioner points out, an opinion is more persuasive when both supported by objective evidence provided by the opining source and consistent with the evidence from other medical and non-medical sources. *See* 20 C.F.R. §

404.1520c(c)(1)-(2).  The Court finds that the ALJ properly explained that the overall
record did not support Dr. Shapiro's opinion for marked-level limitations in any area of
work-related mental functioning. *See* T 19.  The ALJ noted that there were only a few
examinations illustrating remarkable objective findings, T 19 (citing T 487, 494, 634-35,
651 716, 720), and that Plaintiff's adequate range of daily activities indicated that Dr.
Shapiro underestimated Plaintiff's capabilities. T 19 (citing T 297-98, 300, 621, 630)).
Additionally, the ALJ explained that alleged reading difficulties were not reflected in the
clinical record or Dr. Shapiro's objective findings and appeared to be based solely on
the Plaintiff's self-reports. T. 19.  Plaintiff argues that the ALJ erred in the assessment of
Dr. Shapiro's opinion but, as the Commissioner points out, Plaintiff makes no attempt to
show the evidence supported each opined limitation or the severity of the limitations
opined by Dr. Shapiro. *See* Pl. Br. 10-11.

The Court also agrees with the following arguments by the Commissioner:

[T]he ALJ did not discount the entirety of Dr. Shapiro's opinion. In fact, the
RFC assessment for simple tasks; simple work-related decisions;
occasional interaction with supervisors, coworkers, and the public;
occasional changes; and no production pace or quotas accounted for many
of Dr. Shapiro's opinions. (Tr. 16). Plaintiff merely cites to Dr. Shapiro's
examination findings illustrating lethargic motor behavior, a constricted
affect that was reduced in intensity compared to thoughts/speech, and sad
appearance as "sufficient support" for Dr. Shapiro's opinion. (Pl. Br. 10 (Tr.
629-30)). Yet she fails to identify what limitations these findings allegedly
supported.

Similarly, Plaintiff alleges that her activities of daily living did not contradict
Dr. Shapiro's opinion. (Pl. Br. 10-11). Again, the ALJ did not reject Dr.
Shapiro's opinion, instead she explained that Plaintiff's daily activities
demonstrated Plaintiff was not as limited as Dr. Shapiro opined. (Tr. 19).
Significantly, Plaintiff independently took care of her mother-in-law
and the household pets. (Tr. 289, 297). She remained able to cook multi-
course meals with some help from her mother-in-law and husband when
she had little motivation. (Tr. 59, 290, 298). She reported her mother-in-law

did the dishes because it made her mother-in-law feel helpful. (Tr. 59).
However, she could perform the other household chores without prompting
or assistance. (Tr. 290, 298-99). The ALJ only found these activities did not
support marked limitations in Plaintiff's capabilities, and Plaintiff fails to
show error in that conclusion. (Tr. 19).

Def. Br. 13-14.

Plaintiff also relies on her self-reports to Drs. Shapiro and Mohabir to support her

assertion that her bipolar impairment fluctuates so her ability to perform her activities of

daily living was not representative of her functioning. Pl. Br. 10.  However, as the

Commissioner points out, noting a fluctuation of symptoms does not speak to the

*severity* of those symptoms, and the majority of objective evidence illustrated Plaintiff's

normal mental functioning throughout the relevant period. Further, Plaintiff was gainfully

employed while presumably experiencing those fluctuations in 2018 and early 2019, *see*

T 338-39, 633, and was diagnosed with bipolar disorder in 1985 yet had a lengthy work

history subsequent to her diagnosis. *See* T 54, 247.  An RFC reflects the most an

individual can do, and the ALJ determined that Plaintiff's assessed marked limitations

did not reflect the most Plaintiff could do. *See* T 16, 19.  Thus, as the Commissioner

argues, Plaintiff's reported fluctuations in her symptoms did not alone support Dr.

Shapiro's opined limitations.

In the end, Plaintiff fails to demonstrate any error in the ALJ's assessment of Dr.

Shapiro's opinion.

### Dr. Donovan

Dr. Donovan submitted two opinion forms, one on October 16, 2019, and the

second on October 27, 2019. T 611-13, 616-20. In the October 16th opinion, Dr.

Donovan reported he had been treating Plaintiff since 2011 for her bipolar disorder. T

611. He further reported Plaintiff had a "good" response to Lamictal. *Id*. Dr. Donovan reiterated the mental status examination findings from their last session three months earlier, in July 2019, which showed a variable mood, but it was otherwise normal. T 611-12. Dr. Donovan opined Plaintiff had difficulties with pressure and stress. T 612. Further, he opined she was "limited" in her functioning but failed to identify specific limitations as instructed on the form. T 612-13. The ALJ found this opinion limited in persuasiveness because it was vague and slightly contradictory. T 19. Nevertheless, the ALJ found some limitation in each of the four paragraph B criteria at step three—the four areas listed in Dr. Donovan's opinion—and the RFC included limitations reflecting her functioning in these areas. T 15-16, 612-13. Accordingly, the ALJ implicitly included any limitations provided in Dr. Donovan's October 16th opinion.

Regarding the October 27th opinion, the ALJ wrote:

Dr. Donovan reported that the claimant is unable to meet competitive standards concerning stress tolerance, consistent performance, and the ability to complete a normal work schedule without interruption. Dr. Donovan asserted that the claimant is seriously limited, but not precluded from performing 11 other work-related activities, such as accepting criticism and maintaining socially appropriate behavior (Ex. B8F, p. 3). Dr. Donovan opined that the claimant would likely be off-task more than 20% of a typical workday. He predicted that her workplace attendance would be variable (Ex. B8F, p. 4). Dr. Donovan's opinion is somewhat persuasive, as he has treated the claimant, affording him knowledge of her condition. Accordingly, the undersigned has limited the claimant to simple, routine work with limited social contact to address his concerns. Yet the record as a whole does not support the more extreme limitations Dr. Donovan identified. Dr. Donovan's own office notes from 2019 describe the claimant as fully oriented, logical and sensible. Dr. Donovan stated that the claimant's memory and judgment were intact, while her attention and concentration were good (Ex. B11F, pp. 2, 3). Furthermore, there are no testing results to support Dr. Donovan's estimates of time spent off-task and likely workplace attendance. Although the claimant may have sometimes cancelled medical office visits, the record shows that she has generally been able to attend her scheduled appointments without difficulty, including the two consultative examinations,

> the disability hearings, and routine follow-up examinations with her care
> providers. The overall record indicates that the claimant retains greater
> abilities than Dr. Donovan describes.

T 19-20.

Plaintiff contends, *inter alia*, that the ALJ did not specially address that Dr.

Donovan's opinion regarding Plaintiff's limitations was based on stress, and allegedly

ignored Social Security Ruling (SSR) 85-15. Pl. Br. 13.[1]  The Commissioner counters

that the ALJ limited Plaintiff to simple tasks; no work at a production rate pace or with

strict quota requirements; simple instructions and simple work-related decisions; only

occasional interaction with supervisors, coworkers, or the public with no teamwork or

tandem tasks; and a static work environment, with only occasional changes in the work

setting. Def. Br. 17.  Each of these limitations, the Commissioner contends, reduced the

number of stressors Plaintiff would need to process in a work environment, and thus the

ALJ provided for a lower stress work environment which accounted for Dr. Donovan's

opinion that Plaintiff could not function under "normal work stress." *Id.*  Furthermore, the

Commissioner argues, SSR 85-15 does not govern the assessment of medical opinions

and the overall RFC assessment, and ALJ relied on vocational expert testimony not the

Medical-Vocational Rules. *Id.*

"When a claimant suffers from significant stress, the ALJ must address how that

stress might affect the claimant's ability to perform the specific job or jobs that otherwise

fit [her] RFC profile. Indeed, '[b]ecause stress is 'highly individualized,' an ALJ must

'make specific findings about the nature of [a claimant's] stress, the circumstances that

---

[1] *See Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments*, SSR 85-15 (S.S.A. 1985).

trigger it, and how those factors affect [her] ability to work.'" *David H. v. Comm'r of Soc. Sec.*, No. 20-CV-6194-LJV, 2021 WL 2809550, at *1 (W.D.N.Y. July 6, 2021)(quoting *Stadler v. Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) (explaining that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job[,] ... [and a]ny impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment") (citing SSR 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985)). "'Although a particular job may appear to involve little stress, it may, in fact, be stressful and beyond the capabilities of an individual with particular mental impairments.'" *Id.* (quoting *Welch v. Chater*, 923 F. Supp. 17, 21 (W.D.N.Y. 1996)).

The Commissioner's own regulations illustrate and explain the issue:

> [a] claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. [F]or example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons.

> SSR 85-15, 1985 WL 56857, at *6 (emphasis in original). So when stress affects a claimant's ability to function, the ALJ must address any limitations explicitly and uniquely for that claimant. *Stadler*, 464 F. Supp. 2d at 189.

*Id.*

"Plaintiff correctly states the standard laid out in SSR 85-15 which has been recently reiterated by the Second Circuit: 'the Social Security Administration has itself emphasized the importance of crafting an individualized assessment of non-exertional

impairments, such as difficulties interacting with others.'" *Celia A. B.*, 2022 WL 4225540, at *11 (quoting *Rucker v. Kijakazi*, No. 21-621-CV, 2022 WL 4074410, at *4 (2d Cir. Sept. 6, 2022) (citing SSR 85-15, 1985 WL 56857, at *6 ("The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances.... Any impairment-related limitations created by an individual's response to demands of work ... must be reflected in the RFC assessment.")).

"Although an ALJ need not recite every piece of evidence supporting his or her decision, the ALJ must explain his or her decision to a sufficient degree that the Court can glean the rationale." *Celia A. B.*, 2022 WL 4225540, at *11. While the ALJ referenced that Dr. Donovan's second report indicated that Plaintiff would be unable to meet competitive standards concerning stress tolerance, consistent performance, and the ability to complete a normal work schedule without interruption, the ALJ does not specifically discuss Dr. Donovan's stress limitation or treatment records that support the opinion when arriving at the RFC. Thus, the Court is unable to glean the ALJ's rationale for excluding a specific stress related limitation from Plaintiff's RFC. *See id.* ("As the ALJ did not discuss the stress limitation in Dr. Spinks' opinion, or Dr. Gandy's stress limitation and the treatment records that seem to support the opinion, the Court cannot glean the ALJ's rationale in excluding a stress related limitation from plaintiff's RFC."); *David H*, 2021 WL 2809550, at *2 ("The failure to address [Plaintiff's] stress leaves significant gaps in the ALJ's decision and raises significant questions about whether [Plaintiff] could perform the jobs that the ALJ found [her] able to perform."); *see, e.g., id.* ("For example, although the ALJ found that David had a moderate limitation in

interacting with others and acknowledged that David reported social isolation and paranoia, the ALJ did not make any specific findings about how David's stress affected that behavior or what circumstances triggered it.")(cleaned up)(citing *Stadler*, 464 F. Supp. 2d at 189); *cf. Rucker*, 2022 WL 4074410, at *4 (explaining that in the context of SSR 85-15, "the Commissioner argues that any omission as to social interactions was harmless error, since the jobs identified by the vocational expert were consistent with additional restrictions.... We do not agree that the omission was harmless. [T]he Commissioner's logic is circular. The premise of [the plaintiff's] argument is that her social limitations prevent her from being employed in any workplace. To assume that the level '8' jobs would not burden her, because they involve a very low level of human interaction, begs the question of whether that low level is itself sufficient.").

Further, despite that "courts have held that reasoning levels of two and three are compatible with unskilled, simple, and low stress work," *Celia A. B.*, 2022 WL 4225540, at *12, "the ALJ did not ask about, and the vocational expert ("VE") did not address, the mental demands of the jobs that the VE identified, how stressful those jobs are, or how [] stress limitations might affect the performance of those jobs." *David H*, 2021 WL 2809550, at *2 (cleaned up).  Because the assessed extreme limitations caused by Plaintiff's stress might well affect her ability to perform the work that the ALJ found she could do, the ALJ's decision that Plaintiff could perform the jobs identified by the VE is not supported by substantial evidence. *See id.* at *2-3 (By not addressing the mental demands of the jobs the VE identified, how stressful those jobs are, or how marked stress limitations might affect the performance of those jobs, "the ALJ not only failed to address [the plaintiff's] stress and what might cause it, he failed even to consider how

that stress might impact his RFC. For that reason, and because the marked limitations

caused by [plaintiff's]  stress might well affect his ability to perform the work that the ALJ

found he could do, the ALJ erred and his error was not harmless.")(citing *Welch*, 923 F.

Supp. at 20-21)("Even if this Court were to accept the ALJ's general conclusion that

[the] plaintiff has the residual functional capacity to perform simple, low-stress work, this

Court is still unable to determine whether she can perform her past relevant job as a

cleaner without any knowledge regarding the demands of that job. Here, the ALJ

needed to probe into the stress level of [the] plaintiff's past relevant work as a cleaner in

order to determine if, in fact, she currently is capable of performing that job.")(citation

omitted)).

      "Although it is possible . . . the ALJ could determine that plaintiff can perform the

same jobs as previously identified, even considering the impact of her stress, such a

conclusion is best left to the ALJ." *Celia A. B.*, 2022 WL 4225540, at *13 (citing *McGill v.

Berryhill*, No. 16-CV-4970 (RRM/PK), 2018 WL 1368047, at *11 (E.D.N.Y. Mar. 16,

2018) ("[I]n his decision, the ALJ does not address whether such a low-stress limitation

is warranted.... To determine whether the RFC should include a low-stress limitation,

the Court would need to weigh the evidence in the record, a task that is fundamentally

the ALJ's responsibility."). Accordingly, remand for further proceedings is warranted on

this ground. *See Celia A. B.*, 2022 WL 4225540, at *13 (Remaining for further

proceedings because "[t]he ALJ did not reconcile . . .  opinions with her RFC

determination, and it is not evident whether plaintiff's stress is accommodated by a pace

limitation or whether greater restrictions are required.");  *David H.,* 2021 WL 2809550, at

*3 (Remanding for further proceedings because "merely limiting [the plaintiff] to simple

work and only occasional interaction with others without explicitly addressing his marked stress limitations is legally insufficient to account for [the plantiff's] stress."); *see also Stadler*, 464 F. Supp. 2d at 189 (requiring an ALJ "make specific findings about the nature of [a claimant's] stress, the circumstances that trigger it, and how those factors affect his ability to work") (citing SSR 85-15, 1985 WL 56857, at *6); *Burke v. Berryhill*, 2018 WL 1940260, at *4 (Apr. 25, 2018) (finding that the ALJ erred by giving "great weight" to a physician's opinion that the claimant had "moderate[ ] to marked[ ]" limitations in appropriately dealing with stress but limiting the claimant to "unskilled work involving only simple, routine[,] and repetitive tasks" without "perform[ing] the requisite individualized assessment of [the claimant's] limitations in dealing with stress"); *Booker v. Colvin*, 2015 WL 4603958, at *12 (July 30, 2015) (remanding where the ALJ limited the claimant to a "low-stress" environment without making "specific findings concerning the nature of [the claimant's] stress, the circumstances that trigger it, and how those factors affect his ability to work"); *Haymond v. Colvin*, 2014 WL 2048172, at *9 (W.D.N.Y. May 19, 2014) (finding that the RFC's "restricting [the p]laintiff to unskilled work in a 'low stress, low contact' environment[ ] did not adequately take into account the functional limitations caused by her various severe mental impairments on her ability to deal with everyday stressors").

### Opinions Related to Plaintiff's Physical Limitations

Plaintiff contends that the ALJ failed to support with substantial evidence her evaluation of the physical opinion evidence.  In this regard, Plaintiff contends that the ALJ "rejected the opinions of Dr. Naroditsky and Dr. Schmidt-DeYoung simply stating, 'neither doctor ever examined the claimant.'" Pl. Br. 12 (quoting T 14). Plaintiff

further contends that the ALJ "neglected to discuss Dr. Naroditsky's support for his opinion," and that the ALJ "failed to consider the important factor of supportability in considering Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions." *Id.* 12, 13. The Commissioner counters that the ALJ examined the medical records as a whole in determining that Plaintiff's physical impairments (including a history of knee pain, a history of low back pain, and obesity) were not severe medically determinable impairments, and "then considered the prior administrative medical findings from the state agency physicians and the opinion from Dr. Ganesh, the internal medicine consultative examiner, when assessing any alleged limitations resulting from Plaintiff's physical impairments." Def. Br. 18- 20 (citing T 13-14).

The ALJ noted that neither Dr. Naroditsky nor Dr. Schmidt-DeYoung examined Plaintiff, T 14, and therefore, as the Commissioner argues, they could not provide any independent objective findings to support their findings. Def. Br. 20 (citing 20 C.F.R. § 404.1520c(c)(1)).  Furthermore, the ALJ's decision indicates that she did not reject Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions simply because they did not examine Plaintiff, but rather because the record as a whole did not support ongoing physical limitations from Plaintiff's history of knee pain, low back pain, or obesity. *See* T 13-14. In addition, the ALJ noted that Dr. Ganesh "performed a thorough evaluation of the claimant's condition" yet identified no restriction limiting Plaintiff to a reduced range of light work as opined by Drs. Naroditsky and Schmidt-DeYoung.  T. 14.

For these reasons, and for the reasons discussed at pages 18-23 of the Commissioner's brief, the Court finds that the ALJ adequately addressed the persuasiveness of Dr. Naroditsky's and Dr. Schmidt-DeYoung's opinions including the

supportability and consistency thereof. Accordingly, Plaintiff's motion on this ground is denied.

## V.      CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Dkt. No. 10, is **DENIED**, and Plaintiff's motion for judgment on the pleadings, Dkt. No. 9, is **GRANTED in part and DENIED in part**. The decision of the Commissioner is **VACATED**, and the matter is **REMANDED** for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

Dated:  March 31, 2023

Thomas J. McAvoy
Senior, U.S. District Judge